In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3183

INDIANA PROTECTION AND ADVOCACY SERVICES,

*Plaintiff-Appellee,*

*v.*

INDIANA FAMILY AND SOCIAL SERVICES
ADMINISTRATION; ANNE W. MURPHY,
in her official capacity as Secretary of
the Indiana Family and Social Services
Administration; GINA ECKHART, in her official
capacity as Director of the Division of
Mental Health and Addiction; and LARRY LISAK,
in his official capacity as Superintendent
of Larue Carter Memorial Hospital,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-cv-1816-LJM-TAB—**Larry J. McKinney**, *Judge.*

ARGUED FEBRUARY 24, 2010—DECIDED APRIL 22, 2010

Before EASTERBROOK, *Chief Judge*, and POSNER, FLAUM, KANNE, ROVNER, WOOD, WILLIAMS, SYKES, and HAMILTON, *Circuit Judges.**

HAMILTON, *Circuit Judge.*  Pursuant to the federal Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("the PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, the district court ordered Indiana state officials and a state agency to give plaintiff Indiana Protection and Advocacy Services ("IPAS") access to records of two mentally ill patients in a state hospital. On appeal, a panel of this court reversed, finding that the Eleventh Amendment and the lack of a statutory cause of action barred the action. *Indiana Protection and Advocacy Services v. Indiana Family and Social Services Admin.*, 573 F.3d 548, 550-52 (7th Cir. 2009). We granted rehearing *en banc* and hold: (1) the Eleventh Amendment does not bar plaintiff IPAS from seeking injunctive and declaratory relief against named state officials; (2) the PAIMI Act itself provides a cause of action for injunctive and declaratory relief to enforce the Act; and (3) plaintiff is entitled to access to peer review records of treatment of covered mentally ill patients. Accordingly, we affirm the judgment of the district court as modified to direct that the relief runs only against the named state officials in their official capacities.

---

* Judge Tinder did not participate in the consideration of this appeal.

I. *Legislative, Factual, and Procedural Background*

  A. *The PAIMI Act and IPAS*

Upon finding that "individuals with mental illness are vulnerable to abuse and serious injury," Congress enacted the PAIMI Act in 1986 to "ensure that the rights of individuals with mental illness are protected" and to "assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes . . . ." 42 U.S.C. §§ 10801(a)(1), (b)(1), (b)(2)(A). The Act provides funding for a state on the condition that the state designates a "protection and advocacy system" to accomplish these goals. 42 U.S.C. § 10803(2)(A). The Act gives each state a choice. The designated protection and advocacy system may be either an independent state agency or a private entity. 42 U.S.C. § 15044(a) (Developmental Disabilities and Bill of Rights Act), incorporated by reference in 42 U.S.C. § 10802(2). IPAS, an independent state agency, is Indiana's designated protection and advocacy system under the PAIMI Act. Like any protection and advocacy system, it has the power to contract with other agencies or individuals to help provide its services. 42 U.S.C. § 10804.

The PAIMI Act gives a designated protection and advocacy system like IPAS the authority to investigate incidents of abuse and neglect of individuals with mental illness and to pursue administrative, legal, and other remedies on behalf of those individuals. 42 U.S.C.

§ 10805(a)(1). To achieve those objectives, the Act requires that IPAS have a right to access certain patient records. Specifically, the Act requires that IPAS "shall . . . have access to all records of any individual who is a client of the system if such individual . . . has authorized the system to have such access." 42 U.S.C. § 10805(a)(4)(A). The Act also requires that IPAS "shall . . . have access to all records of . . . any individual (including an individual who has died or whose whereabouts are unknown) (i) who . . . is unable to authorize the system to have such access; (ii) who does not have a legal guardian . . . ; and (iii) with respect to whom . . . there is probable cause to believe that such individual has been subject to abuse or neglect." 42 U.S.C. § 10805(a)(4)(B).

Whether a state designates an independent state agency or a private entity as its protection and advocacy system, the system such as IPAS must have, under federal law:

> the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and pursue administrative, legal, and other appropriate remedies on behalf of an individual who . . . was [an] individual with [a] mental illness; and . . . is a resident of the State, but only with respect to matters which occur within 90 days after the date of discharge of such individual from a facility providing care or treatment.

42 U.S.C. §§ 10805(a)(1)(B), (C). The Act further requires:

> Prior to instituting any legal action in a Federal or State court on behalf of a[n] individual with mental

illness, an eligible system, or a State agency or non-profit organization which entered into a contract with an eligible system under section 10804(a) of this title, shall exhaust in a timely manner all administrative remedies where appropriate. If, in pursuing administrative remedies, the system, agency, or organization determines that any matter with respect to such individual will not be resolved within a reasonable time, the system, agency, or organization may pursue alternative remedies, including the initiation of a legal action.

42 U.S.C. § 10807(a).

The PAIMI Act requires that the designated system, whether it is a public or private entity, "shall be independent of any agency which provides treatment or services (other than advocacy services) to individuals with mental illness." 42 U.S.C. § 10805(a)(2). In states like Indiana, in which the governing authority of the agency is a multi-member governing board, the governor may appoint no more than one-third of the board members. 42 U.S.C. §§ 10802(2), 15044(a)(2). Consistent with that requirement, IPAS is governed by a board of thirteen persons. Four are appointed by the governor. The other nine are appointed by majority vote of the governing board itself. Ind. Code § 12-28-1-6(a). No board member may be an official or employee of any state agency that delivers services to the population served by IPAS. Ind. Code § 12-28-1-6(b). Having designated IPAS as the state's protection and advocacy system, Indiana is prohibited from redesignating a different agency or entity without "good cause." 42 U.S.C. § 15043(a)(4)(A).

B. *Patients 1 and 2 and the Record Requests*

Larue Carter Memorial Hospital is a psychiatric hospital operated by the Division of Mental Health and Addiction of the Indiana Family and Social Services Administration. A person identified in the record as Patient 1 was admitted to Larue Carter on June 21, 2006. Patient 1 was transferred to Wishard Memorial Hospital six days later and died at Wishard on July 31st. In response to Patient 1's death, a Mortality Review Committee convened at Larue Carter on August 11th. The Committee's report was completed on August 28th. In the meantime, a Larue Carter staff member provided information to IPAS that led it to open an abuse and neglect investigation concerning Patient 1's care while at Larue Carter. An IPAS advocate reviewed Patient 1's chart at Larue Carter and then requested Patient 1's "complete chart" on August 30th. The hospital denied IPAS's request, explaining that Patient 1's parents had not signed a release. On September 13th, IPAS also requested a copy of reports prepared by the Mortality Review Committee. The hospital also denied this request.[1]

Another person identified as Patient 2 was admitted to Larue Carter in November 2003. On August 26, 2006, Patient 2 left Larue Carter's grounds without approved leave. He was apprehended by a state police officer with assistance from hospital staff. Upon his return to

---

[1] The parties have advised the court that the defendants now have released Patient 1's medical records to IPAS but not the peer review records.

the hospital, Patient 2 filed a grievance with the hospital alleging that three hospital employees and two police officers had battered, assaulted, and attempted to murder him. Patient 2 also filed a complaint with IPAS and signed a release authorizing IPAS to have access to his records. IPAS requested a copy of the hospital's investigation into Patient 2's grievance. The hospital provided a summary of its "investigation results" but did not provide any of the underlying records. IPAS also requested the "incident report" generated by Larue Carter in response to the events of August 26th. The hospital also denied this request.[2]

The PAIMI Act defines "records" broadly to include "reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records." 42 U.S.C. § 10806(b)(3)(A). In 1997, the United States Department of Health & Human Services issued a set of regulations for the PAIMI Act. The regulations define the word "records" broadly, 42 C.F.R. §§ 51.41(c)(1)-(4), but note

---

[2] The defendants contend on appeal that no investigative reports were actually created with respect to Patient 2 and that they have provided IPAS with access to all incident reports. IPAS is not yet convinced that it has all the documents about Patient 2 that it seeks, and that is a disputed issue better addressed to the district court.

"that nothing in this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees." 42 C.F.R. § 51.41(c)(4).[3] The PAIMI Act aside, Indiana state law regulates the disclosure of "communications, proceedings, records, determinations, or deliberations" of a "peer review committee." Ind. Code § 34-30-15-1(f)(2).[4]

## C. *Procedural History*

IPAS sued the State of Indiana, the Family and Social Services Administration, and three named state officials in their official capacities. IPAS sought injunctive and declaratory relief under the PAIMI Act, requesting a declaration that the defendants violated IPAS's right to access the requested records and a permanent injunction against restricting IPAS's reasonable access to "records" as defined by the PAIMI Act. IPAS did not seek monetary

---

[3] The Department of Health and Human Services has issued new proposed regulations under the Developmental Disabilities Act that would remove this exception for peer review records, see 73 Fed. Reg. 19708, 19731-32 (April 10, 2008), but the department has not taken final action.

[4] A "peer review committee" under Indiana law is a committee that is organized by a hospital or other medical facility having the responsibility of evaluating the qualifications of a professional health care provider, the patient care rendered by a professional health care provider, or the merits of a complaint brought against a professional health care provider. Ind. Code § 34-6-2-99(a).

damages. Each side moved for summary judgment. IPAS argued that the defendants were violating the PAIMI Act by denying it access to the records it requested. The defendants asserted that the PAIMI Act did not require them to give IPAS access because IPAS did not have the consent of Patient 1's parents and because the peer review and root cause documents were not covered by the PAIMI Act. The court granted IPAS's motion and entered judgment for IPAS.

On appeal, the defendants argued only that the district court erred on the merits of the "records" issue. A panel of this court reversed. *Indiana Protection and Advocacy Services v. Indiana Family and Social Services Admin.*, 573 F.3d 548, 550-53 (7th Cir. 2009). The panel did not reach the merits but ordered supplemental briefing and then found: (a) the PAIMI Act did not give IPAS an express right of action; (b) IPAS could not sue under 42 U.S.C. § 1983 because IPAS is a state agency and thus is not a "person" for purposes of that section; and (c) the Eleventh Amendment barred IPAS's suit, and the *Ex parte Young* doctrine would not provide an exception. The panel viewed IPAS's lawsuit as a suit by one arm of the state suing another, and viewed the remedy IPAS sought as a remedy for a concrete injury rather than an injunction for prospective relief. *Id*. at 553. We granted IPAS's petition for rehearing *en banc*. The United States has appeared as *amicus curiae* in support of IPAS.

II. *The Eleventh Amendment and Ex parte Young*

The Eleventh Amendment to the Constitution provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Notwithstanding the phrase "Citizens of another State," the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (internal citations omitted). If properly raised, the amendment bars actions in federal court against a state, state agencies, or state officials acting in their official capacities. *Id*. at 663.

The defendants engaged in two rounds of litigation of this case—one before the district court, and one before this court—without raising the Eleventh Amendment as a defense to IPAS's action. After the panel raised the issue, defendants embraced it. The Eleventh Amendment is unusual in that it does not strictly involve subject matter jurisdiction and is thus waivable, see *Lapides v. Board of Regents of Univ. System of Georgia*, 535 U.S. 613, 620 (2002), but a court may raise the issue itself, *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000) (affirming dismissal on district court's own initiative); see generally *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010) (reminding lower federal courts to preserve distinction between genuine jurisdictional restrictions and other claim-processing requirements or elements of

claims). If the panel had not chosen to raise the Eleventh Amendment issue, this non-jurisdictional defense would have been forfeited. See *Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381, 389 (1998). Because the panel opened the door, however, we address the defense.

There are three principal types of exceptions to the Eleventh Amendment's bar. See *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323, 337 (7th Cir. 2000). First, a state may waive immunity by consenting to suit in federal court. Second, Congress may abrogate the state's immunity through a valid exercise of its powers under recognized constitutional authority, such as by later constitutional amendments. Third, under *Ex parte Young*, 209 U.S. 123, 159-60 (1908), a plaintiff may file "suit[ ] against state officials seeking prospective equitable relief for ongoing violations of federal law. . . ." *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997). *Ex parte Young* began with a suit against state officials to enjoin enforcement of a state railroad commission's order requiring rate reductions. Plaintiffs contended that the rate reductions would violate the United States Constitution. See 209 U.S. at 129-30. The Supreme Court held that the Eleventh Amendment did not bar the plaintiff's suit, explaining that when a state official violates the federal Constitution, that official acts outside the scope of his or her authority and is no longer entitled to the state's immunity from suit. *Id.* at 155-56. *Ex parte Young* applies to suits to enforce federal statutes as well as the federal Constitution. See *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 156 n.6 (1978) (holding that *Ex parte Young* allowed suit in federal court against named state

official for violating federal statute); see also *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (*Ex parte Young* authorized suit against state officials challenging state statute as preempted by federal statute); *MCI Telecommunications*, 222 F.3d at 345 (applying *Ex parte Young* to suit against state officials under federal Telecommunications Act). IPAS argues that *Ex parte Young* authorizes this suit against state officials seeking prospective relief. We agree.

A court applying the *Ex parte Young* doctrine now "need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002), quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment). That inquiry is satisfied here. IPAS named individual state officials as defendants in its lawsuit. It alleges that those officials have obstructed its access to records under the PAIMI Act, an ongoing violation of federal law. The relief IPAS seeks—reasonable access to the records—is also prospective.[5]

---

[5] The defendants suggest that *Ex parte Young* does not apply because the Supreme Court has applied the Eleventh Amendment to plaintiffs' efforts to obtain federal court orders to state governments to turn over property to plaintiffs. See generally *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670 (1982). *Treasure Salvors* and other historic shipwreck cases

(continued...)

We cannot fault the district court for not addressing a defense that the defendants chose not to raise. Once the Eleventh Amendment issue was on the table, however, IPAS conceded that it may not sue either the State of Indiana or any of its agencies. We modify the judgment to remove the State and the Family and Social Services Administration as named defendants, but the official capacity claims against the named state officials survive under *Ex parte Young*.

To avoid *Ex parte Young*, defendants offer two related arguments based on the nature of the plaintiff. First, defendants argue that because IPAS is technically a state agency, its federal lawsuit is a special sort of infringement of the state's sovereignty. Relying on *Coeur d'Alene Tribe*, defendants assert that "to permit Indiana to sue Indiana in federal court would plainly upset the State's core sovereignty interests." Second, defendants

---

[5] (...continued)

such as *California v. Deep Sea Research, Inc.*, 523 U.S. 491 (1998), and *Zych v. Wrecked Vessel Believed to be the Lady Elgin*, 960 F.2d 665 (7th Cir. 1992), populate a colorful corner of Eleventh Amendment law, but they provide no relevant guidance here. IPAS does not seek to seize possession of the state records. IPAS seeks only *access* to the records. Permitting IPAS to inspect and copy the records would not infringe on the defendants' otherwise rightful ownership and possession of the records. See *Barnes v. Black*, 544 F.3d 807, 812 (7th Cir. 2008) (stating that federal court orders to state governments to produce documents for inspection do not compromise state sovereignty or violate Eleventh Amendment).

argue that this lawsuit is merely an "intramural" suit between two state agencies. Def. Rehearing Br. 11-13.

The threshold problem with these arguments is that the *Ex parte Young* doctrine focuses on the identity of the defendant and the nature of the relief sought, not on the nature or identity of the plaintiff. In any event, *Coeur d'Alene Tribe* does not support defendants here. In that case, a federally-recognized Indian tribe sought a declaratory judgment in federal court against the state of Idaho, various state agencies, and several state officials in an effort to establish the tribe's entitlement to the exclusive use and occupancy and the right to quiet enjoyment of the submerged lands and bed of Lake Coeur d'Alene. The Supreme Court held that the Eleventh Amendment barred the tribe's suit and that the *Ex parte Young* exception did not apply. The Court recognized that "an allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." 521 U.S. at 281. Nevertheless, the Court treated *Coeur d'Alene Tribe* as an unusual case that was an exception to the *Young* doctrine because it would decide the state's ownership and legal and regulatory authority over "a vast reach of lands and waters long deemed by the State to be an integral part of its territory." 521 U.S. at 282.

Although *Coeur d'Alene Tribe* seemed to introduce a new balancing approach (and new uncertainty) to the application of *Ex parte Young*, see *id.* at 278, the Supreme Court then turned away from that balancing approach in *Verizon Maryland* and returned to the "straightforward"

inquiry into "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." 535 U.S. at 645; see *Ameritech Corp. v. McCann*, 297 F.3d 582, 588 (7th Cir. 2002) ("While the Supreme Court [in *Coeur d'Alene Tribe*] seemed to advocate this balancing approach, a majority of the Court in *Verizon* rejected it."); see also *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 912 (10th Cir. 2008) (noting that *Verizon* limited the "reach" of *Coeur d'Alene Tribe*).

Regarding defendants' second argument to avoid *Ex parte Young*, we have written in a different context that "federal courts should not get involved unnecessarily in what may be intramural struggles of state government even if invited to do so by one of the contenders." *Mazanec v. North Judson-San Pierre School Corp.*, 763 F.2d 845, 848 (7th Cir. 1985). And it is difficult to see how a case or controversy exists within the meaning of Article III of the Constitution if, for example, one state agency sues another and the heads of both agencies serve at the pleasure of the governor. It would be as if the governor were suing himself.

But a closer look at the details of this case shows that the defendants' effort to portray this case as an "intramural" dispute is not persuasive. While the defendant Secretary of the Family and Social Services Administration serves at the pleasure of the governor, plaintiff IPAS is not a traditional state agency. It is independent of the governor to a degree that is unusual and perhaps unique among Indiana agencies. In the PAIMI Act, Congress took care to insulate protection and advocacy services, including those that are state agencies, from state gov-

ernment control. As noted, the governor may not appoint more than one third of the IPAS governing board. 42 U.S.C. § 10802(2); Ind. Code § 12-28-1-6(a)(1). The federal government funds IPAS directly under the PAIMI Act. IPAS is exempt from personnel measures potentially affecting other state agencies, such as hiring freezes, reductions in force, prohibitions on travel, or any other policies that might interfere with IPAS's ability to carry out its functions. 42 U.S.C. § 15043(a)(2)(K). As a matter of federal law, IPAS has authority, independent of the state administration, to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B). Congress thus has provided as a matter of federal law that IPAS is insulated from the type of state control over policy, budget, personnel, and governance that could justify treating this as an "intramural" dispute. In a sense, given its unusual independence from state government, the special federal responsibilities it carries out, and the direct federal funding it receives, IPAS is closer to being a specialized agent of the federal government for these purposes than it is to being an ordinary state agency.

Indiana's use of IPAS's status as an independent state agency to support the State's late reliance on the Eleventh Amendment to block this lawsuit also seems, frankly, unfair. Congress gave each state the choice to establish a protection and advocacy system as either an independent state agency or a private not-for-profit entity. Indiana made the choice to set up IPAS as an independent state agency. If we gave that choice any weight in the Eleventh

Amendment inquiry, we would be permitting Indiana to use its own choice to set up an independent state agency as a means to shield its state hospitals and institutions from the very investigatory and oversight powers that Congress funded to protect some of the state's most vulnerable citizens. That result would be strange indeed. The combination, moreover, of the state's choice to set up an independent agency and its failure to raise the Eleventh Amendment issue itself also makes it difficult to see how this lawsuit poses a serious threat to any special sovereignty interest of the state.[6]

The defendants suggest that IPAS is free to bring its lawsuit against the state defendants in state court. However, they point to no state law that would provide an adequate remedy, and if the Eleventh Amendment prohibited IPAS from suing the defendants under the PAIMI Act in federal court, it would also prohibit IPAS from suing the defendants under the PAIMI Act in state court. See *Alden v. Maine,* 527 U.S. 706, 754 (1999) (holding that Congress cannot abrogate the states' immunity from private suit in their own courts).[7]

---

[6] It is abundantly clear that Congress was spurred to action based on the conditions within *state-operated* facilities. The PAIMI Act of 1986 resulted from a nine-month Congressional staff investigation that detailed appalling conditions in many state-operated mental health institutions. See S. Rep. 99-109 at 1 (1985), and S. Hrg. 99-50, Pt. 2 (1985) (staff report).

[7] After the *en banc* argument, defendants submitted a letter stating that they would have no immunity from a mandamus action in state court. Even if that were enough to avoid the

(continued...)

In short, IPAS's lawsuit is a classic application of *Ex parte Young*. It asks a federal court to order state officials to modify their conduct to comply with federal law. Plaintiff's status as an unusually independent state agency does not change the *Young* analysis. The Eleventh Amendment does not bar IPAS's request for declaratory and injunctive relief against the named state officials.[8]

---

[7]  (...continued)
straightforward application of *Ex parte Young* here, and it is not, the state court option would also be inadequate. The applicable law would be federal law—the right of access to records granted in 42 U.S.C. § 10806—so the *Alden v. Maine* problem would remain. Indiana has not enacted legislation granting such rights under state law. Moreover, Congress clearly intended the protection and advocacy systems—all of them—to be able to respond quickly to threats of imminent harm to their constituents. See, *e.g.*, 42 U.S.C. § 10805(a)(4)(C) (permitting systems to access records of individuals with mental illness who have legal guardians or representatives but whose health or safety is in serious and immediate jeopardy if the individual's guardian or representative has refused to act); 42 U.S.C. § 10807(b) (providing exception to the system's obligation to pursue administrative remedies prior to filing suit where legal action is instituted to prevent or eliminate imminent harm to an individual with mental illness). As counsel for IPAS put it at oral argument, there is no such thing as a "preliminary mandamus" action.

[8]  The Fourth Circuit reached a different conclusion in *Virginia v. Reinhard*, 568 F.3d 110, 118-24 (4th Cir. 2009) (holding that protection and advocacy state agency's suit seeking records

(continued...)

III. *Right of Action Under the PAIMI Act*

The defendants next argue that the PAIMI Act does not itself provide IPAS with a cause of action to seek equitable relief. Defendants contend that protection and advocacy systems can sue only under 42 U.S.C. § 1983. But, citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65-66 (1989) (holding that a state agency was not a "person" that could be sued as a defendant under § 1983), defendants' catch is that IPAS is a state agency and thus is not a "person" under section 1983. See *Virginia Office for Protection and Advocacy v. Reinhard*, 405 F.3d 185, 189-90 (4th Cir. 2005) (state agency could not sue under section 1983 to enforce rights under PAIMI Act). If that's true, then IPAS and other state-agency protection and advocacy systems cannot obtain relief in federal court by any avenue. According to defendants, the only relief from Indiana's violations of the PAIMI Act would be for the federal government to cut off funding for IPAS itself— a sanction that would serve only to undermine the PAIMI Act rather than enforce it.

---

[8]  (...continued)

under the PAIMI Act was barred by Eleventh Amendment; *Ex parte Young* not applicable to suit where plaintiff was state agency), *petition for cert. filed*, 78 U.S.L.W. 3416 (U.S. Jan. 19, 2010) (No. 09-529). For the reasons explained in the text, we respectfully disagree. We also note that the Virginia defendants had argued in an earlier case that the state protection and advocacy system had obtained relief under *Ex parte Young*. See *Virginia Office for Protection and Advocacy v. Reinhard*, 405 F.3d 185, 187-88 (4th Cir. 2005).

We reject that improbable interpretation of the Act. We hold that the PAIMI Act itself authorizes IPAS to bring this suit for injunctive and declaratory relief.[9] To determine whether a cause of action exists, "the judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002), quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692, n.13 (1979). Where a statute "by its terms grants no private rights to any identifiable class," the question whether Congress intended to create a cause of action "is definitively answered in the negative." *Gonzaga*, 536 U.S. at 283-84, quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576 (1979). Where the text and structure of a statute do not provide an indication that Congress intended to create new individual rights, there is no basis for a private suit. *Gonzaga*, 536 U.S. at 286.

Looking to the PAIMI Act, we find that Congress expressed its intent to create a legally enforceable right of access to patient records vested in an identifiable class—protection and advocacy systems, including IPAS, which act for the benefit and protection of mentally ill individuals who may have difficulty acting for themselves.

---

[9] The parties agree that the PAIMI Act does not provide IPAS (or other protection and advocacy systems) with a cause of action for damages.

If and when those protection and advocacy systems are denied their right of access, the PAIMI Act shows with sufficient clarity that the remedy is a suit to enforce the right of access in federal or state court.

Congress phrased the PAIMI Act in terms that grant rights to the protection and advocacy system in each state: "A system established in a State under section 10803 of this title to protect and advocate the rights of individuals with mental illness shall— . . . (3) have access to facilities in the State providing care or treatment; (4) in accordance with section 10806 of this title, have access to all records of" several categories of patients. See 42 U.S.C. § 10805(a). This is not only a condition for funding. The Act further provides that the system shall have the power to bring legal actions to ensure the protection of its constituents and to litigate on behalf of its constituents. A system designated under the Act "shall have the authority to pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State" and to "pursue administrative, legal, and other remedies" on behalf of individuals with mental illness who are receiving or have received care or treatment from a facility up to 90 days after their discharge from care. 42 U.S.C. §§ 10805(a)(1)(B), (a)(1)(C). A suit for access to patient records falls squarely within the statutory authority to pursue "legal and other appropriate remedies to ensure the protection of individuals with mental illness. . . ."

As we read the statute, these powers are conferred upon a protection and advocacy system like IPAS as a matter

of federal law by virtue of its designation by a state. Contrary to the dissent's suggestion, nothing in the PAIMI Act requires the state to adopt legislation or regulations granting such powers as a matter of state law.

Another section of the PAIMI Act offers further evidence that Congress intended that protection and advocacy systems have the ability to sue under the Act. The Act requires that *"prior to instituting any legal action in a Federal or State court* on behalf of a[n] individual with mental illness, an eligible system . . . shall exhaust in a timely manner all administrative remedies where appropriate. If . . . the system . . . determines that any matter with respect to such individual will not be resolved within a reasonable time, the system . . . may pursue alternative remedies, including the initiation of a legal action." 42 U.S.C. § 10807(a) (emphasis added). The provision would have little purpose if protection and advocacy systems like IPAS were not empowered to sue to enforce the PAIMI Act.[10]

---

[10] The dissent criticizes our reliance on section 10807 as turning a precondition to suit into an authorization to sue. *Post* at 57. Our point is simply that when Congress established the precondition to suit, it obviously assumed that the suit could be brought in the first place. We also see nothing in the statutory phrase "any legal action in a Federal or State court on behalf of an individual with mental illness" that would exclude this or similar suits for access to records of individuals with mental illness. If the dissent is correct that 42 U.S.C. § 1983 offers a cause of action—but only for private

(continued...)

The defendants argue that the PAIMI Act is an exercise of Congress's spending power to condition receipt of specified federal funds on compliance with specified terms. The defendants contend that, like the spending power statutes at issue in *Sandoval* and *Gonzaga*, the PAIMI Act does not include an express provision for a private right of action and may be enforced only by a federal executive action to terminate a non-compliant state's funding. The argument reads *Sandoval* and *Gonzaga* too broadly. Both eschew sweeping rules and instead teach the need for close attention to the specific language and structure of the statute at issue. Both cases are easily distinguishable based on the critical features of the Supreme Court's reasoning.

The plaintiff in *Sandoval* sued to enforce disparate-impact regulations promulgated by the Department of Justice under Title VI of the Civil Rights Act of 1964.[11] The particular regulation under review forbade funding recipients from "utiliz[ing] criteria or methods of ad-

---

[10] (...continued)
entities—section 10807 might be more useful. But there is no indication in the statute or elsewhere that Congress intended that a state's choice between the two types of protection and advocacy systems would have such dramatic consequences for their enforcement powers.

[11] Title VI provides that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. § 2000d.

ministration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin." Alabama amended its Constitution to declare English "the official language of the state" and began administering state driver's license examinations only in English. Sandoval sued for an injunction against the director of the state agency. The Supreme Court recognized that Title VI itself included an implied private right of action for both injunctive relief and damages for violations of the statute itself, but the Court found that the same authority did not extend to violations of the disparate-impact regulation. *Sandoval*, 532 U.S. at 279-80, 293. The Court pointed out that the regulation was phrased not in terms of creating rights but in terms of instructions to federal funding agencies. *Id*. at 288-89. The Court explained that "statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289, quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981). The disparate-impact regulation's focus was "twice removed from the individuals who will ultimately benefit from Title VI's protection" because it was "'phrased as a directive to federal agencies engaged in the distribution of public funds.'" 532 U.S. at 289, quoting *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 772 (1981) (analyzing the Davis-Bacon Act).

A year after *Sandoval*, the Court in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), held that the Family Educational Rights and Privacy Act of 1974 did not provide a private right of action for damages and created no rights

enforceable under 42 U.S.C. § 1983. The Court therefore reversed a jury verdict for damages in favor of an individual and against a recipient of federal funds. FERPA, like section 602 of Title VI, was enacted under Congress's spending power. It directs the Secretary of Education to withhold federal funds from any educational institution that fails to comply with certain conditions. One condition is that the institution not release a student's educational records without written consent. See 20 U.S.C. § 1232g(b)(1). A university official discussed allegations of sexual misconduct against Doe and thus prevented him from being certified as a teacher. Doe sued, arguing that section 1232g(b)(1) of FERPA granted him a right enforceable under section 1983 to sue for damages caused by the unauthorized release of personal information. The Court disagreed, finding that section 1983 provided a remedy for the deprivation only of "rights," not of vague benefits or privileges, and that Congress had not granted any private rights to any class of individuals in FERPA. *Gonzaga*, 536 U.S. at 283-84. FERPA's non-disclosure provisions lacked "rights-creating" language and spoke only to the Secretary of Education, directing that "no funds shall be made available" to an institution with a prohibited policy or practice. *Id*. at 287, quoting 20 U.S.C. § 1232g(b)(1). The focus of the statute, again, was "two steps removed from the interests of individual students" and did not confer individual rights. *Id*.

Our dissenting colleague contends that *Brunner v. Ohio Republican Party*, ___ U.S. ___, 129 S. Ct. 5 (2008), conflicts with our reasoning here. In *Brunner*, the Court issued a one-paragraph emergency opinion summarily vacating a

temporary restraining order that had directed the Ohio Secretary of State to update Ohio's voter database to comply with section 303 of the Help America Vote Act of 2002 a few weeks before the national election. Citing *Gonzaga* and *Sandoval*, the Supreme Court wrote that the plaintiffs were "not sufficiently likely to prevail on the question whether Congress has authorized . . . the issuance of a TRO." *Brunner*, 129 S. Ct. at 6.

Close examination of the statute at issue and the opinions from the Sixth Circuit's *en banc* review illuminates the Supreme Court's terse conclusion and shows that our conclusion here is consistent with the case. The statute in *Brunner* provided:

> The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

42 U.S.C. § 15483(a)(5)(B)(i). The state's chief election official had allegedly stopped sending data about potential "mismatches" between motor vehicle and voter registration lists some weeks before the national election. A political party and a candidate sued to require the state election official to resume sending such data, which could have provided the basis for widespread election-day challenges to voter eligibility. Within the

space of a mere two weeks, a district court granted a temporary restraining order, a panel of the Sixth Circuit vacated the TRO, the Sixth Circuit *en banc* reinstated the TRO, and the Supreme Court finally vacated the TRO.

On the issue of the private right of action, the Sixth Circuit majority considered *Gonzaga* and its instructions that, in identifying statutory rights enforceable under section 1983, "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced" under § 1983, and that "such rights must be 'unambiguously conferred . . . to support a cause of action brought under § 1983.'" *Ohio Republican Party v. Brunner*, 544 F.3d 711, 719-20 (6th Cir. 2008) (*en banc*) (emphasis in original), quoting *Gonzaga*, 536 U.S. at 283. The Sixth Circuit majority concluded that whether the HAVA provision requiring data-sharing agreements between election officials and motor vehicle officials created enforceable rights was a difficult and close question that did not undermine the district court's TRO. *Id.* at 720-21. Judge Moore's dissenting opinion explained in detail why the data-sharing provision of HAVA did not create rights enforceable by individuals. 544 F.3d at 726-30. As in *Gonzaga* and *Sandoval*, the statute did not contain rights-creating language. Instead, it authorized the United States government to sue to enforce the mandates directed at state officials.

*Sandoval*, *Gonzaga*, and *Brunner* do not stand for a broad rule that spending power statutes can never be enforced by private actions. They show that courts must examine each statutory scheme closely. Close examination of the PAIMI Act shows that this lawsuit to enforce IPAS's

right of access to records is exactly what Congress intended to authorize. Unlike the statutes in *Sandoval* and *Brunner* and the regulation in *Gonzaga*, the PAIMI Act's key language is not directed at an administrator of federal funds or even at the State of Indiana as a funding recipient. Instead, the Act directly grants rights and powers to the designated protection and advocacy system that is the plaintiff here. As the designee, IPAS "shall . . . have access to all records," 42 U.S.C. § 10805(a)(4), and "shall have the authority to pursue administrative, legal, and other appropriate remedies." 42 U.S.C. § 10805(a)(1)(B). These rights are not one or two steps removed from IPAS—they are granted directly to IPAS itself. The PAIMI Act's key requirements are not directed at the states as recipients of the funds. (The federal allotments go directly to the protection and advocacy systems, not to the states. See 42 U.S.C. § 10803.) Of states, the Act requires only that they designate their chosen protection and advocacy systems and give them the required independence. The Act does not require states to take additional steps to empower the designated protection and advocacy systems, and Indiana has not done so. See generally Ind. Code § 12-28-1-1 *et seq*. Under the language of the federal statute, such efforts would be redundant.

  Congress expressed with sufficient clarity its intent to grant immediate and legally enforceable rights to the states' designated protection and advocacy systems. Once Indiana designated IPAS, Congress vested IPAS with the right to access the necessary records and the right to sue directly under the PAIMI Act if that access is denied.

The PAIMI Act also lacks separate administrative enforcement mechanisms comparable to those that were important factors in *Sandoval*, *Gonzaga*, and *Brunner*. Section 602 of Title VI, scrutinized in *Sandoval*, empowered the Department of Justice to enforce its regulations by terminating funding to "the particular program, or part thereof," but only after notifying the recipient department or agency of its failure to comply and "fil[ing] with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." *Sandoval,* 532 U.S. at 289-90, quoting 42 U.S.C. § 2000d-1. The Court found that section 602 expressly provided "one method of enforcing a substantive rule suggest[ing] that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.

Similarly, FERPA, at issue in *Gonzaga*, directs the Secretary of Education to establish an office and review board for "investigating, processing, reviewing, and adjudicating violations of [FERPA]." 20 U.S.C. § 1232g(g). Students and parents who suspect a violation can file written complaints with the board, which can initiate investigations. See 34 C.F.R. §§ 99.63-99.67. If the Secretary determines that a recipient institution is failing to comply with FERPA and that compliance cannot be secured voluntarily, the statute allows the Secretary to terminate funding to the institution. 20 U.S.C. §§ 1234c(a), 1232g(f). The *Gonzaga* Court found that Congress's decision to provide a mechanism to enforce FERPA buttressed its conclusion that the statute did not confer individual rights. *Gonzaga*, 536 U.S. at 289-90.

And as Judge Moore explained in her dissent in *Brunner*, the Help America Vote Act, too, specified that "the Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the . . . requirements under [sections 301, 302, and 303]." 42 U.S.C. § 15511; see 544 F.3d at 729-30. The statute also required states to establish detailed "State-based administrative complaint procedures" to resolve disputes under the statute. See 42 U.S.C. § 15512. That statutory provision for administrative remedies further likens the statute in *Brunner* to the statutes under review in *Sandoval* and *Gonzaga* and distinguishes it further from the PAIMI Act, which has no comparable provisions for administrative or executive enforcement against the states.[12]

---

[12] Although the defendants did not make this point in their briefs, the dissent observes that the PAIMI Act has an administrative enforcement mechanism under 42 C.F.R. § 51.10. That regulation authorizes suspension or termination of grant payments, among other actions, based on a protection and advocacy system's failure to comply with the Act. The problem for the dissent is that the regulation provides for remedies *only against a protection and advocacy system*, if for example it fails to live up to its obligations to submit annual reports or other documentation in response to review and monitoring by the federal government. Such remedial actions could lead to suspension or termination of funding to the system. See *id.*, incorporating 45 C.F.R. Part 74, 42 C.F.R. Part 50. (Another administrative mechanism establishes a detailed procedure a
(continued...)

More fundamentally, under the PAIMI Act, the remedy of a funding cut-off for violations of the Act would be perversely counterproductive. As the findings set forth in 42 U.S.C. § 10801 show, Congress wanted to establish a protection and advocacy system that would protect and advocate for the rights of individuals with mental illness and investigate incidents of abuse and neglect of those individuals. See 42 U.S.C. § 10801(b). Responding to a state's violation of the Act by cutting off funding for that very system would undermine the purpose of the entire Act. It is highly unlikely that Congress intended for such a funding cut-off to be the response to such violations by a state.

IPAS has argued that 42 U.S.C. § 1983 provides an alternative basis for its suit and that its director could become the plaintiff (attempting to avoid the state agency problem discussed above). Section 1983 fits awkwardly with the PAIMI Act because a protection and advocacy system has rights against both public and private care providers. The latter would not act under color of state law and could not be reached under section

---

[12] (...continued)

state must follow to designate a new protection and advocacy system. 45 C.F.R. § 1386.20.) None of these administrative enforcement mechanisms offer any relief at all for IPAS or any other protection and advocacy system if a recalcitrant state violates its obligations, such as the obligation to provide access to patient records. Unlike the situations in *Sandoval*, *Gonzaga*, and *Brunner*, the only available remedy for the violations alleged by IPAS is a lawsuit to enforce its rights under the PAIMI Act.

1983. We agree with the position advocated by the United States as *amicus curiae*. Because the PAIMI Act itself provides a cause of action for equitable relief, we decline to address IPAS's ability to pursue relief under 42 U.S.C. § 1983.

The dissent also contends that our decision runs afoul of the "clear-statement" principle expressed in *Arlington Central School District Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), among other cases. Congress cannot subject the state to suit by the protection and advocacy system, goes the argument, without spelling out more clearly in the statute that such suits are authorized; otherwise it would be as if one party to a contract tried to sneak an onerous provision into the deal without the other party's knowledge. This argument of unfair surprise would have more weight if it had been raised by the state defendants before the district court, or before the panel, or indeed in any other protection-and-advocacy lawsuits against state defendants in more than 20 years of experience under the PAIMI Act. Instead, it is the argument itself that is the late surprise.

State hospitals and institutions were the primary concern of the PAIMI Act, see note 6, above, and for more than 20 years under the PAIMI Act, we and other circuits and numerous district courts have heard similar suits under the PAIMI Act. See, *e.g.*, *Disability Rights Wisconsin, Inc. v. State of Wisconsin Dep't of Public Instruction*, 463 F.3d 719, 725 (7th Cir. 2006) (reversing denial of injunction where private protection and advocacy system sought records from state agency, without

relying on 42 U.S.C. § 1983, and providing history of protection and advocacy legislation); *Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction & Advocacy Servs.*, 448 F.3d 119 (2d Cir. 2006) (affirming injunction in favor of state agency to obtain access to patient records)[13]; *Missouri Protection & Advocacy Servs. v. Missouri Dep't of Mental Health*, 447 F.3d 1021 (8th Cir. 2006) (affirming injunction requiring access to patient records under 42 U.S.C. § 1983); *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262 (10th Cir. 2003) (reversing denial of injunction); *Pennsylvania Protection & Advocacy, Inc. v. Houstoun*, 228 F.3d 423 (3d Cir. 2000) (affirming injunction requiring access to patient records); see also, *e.g.*, *Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Hartford Board of Educ.*, 464 F.3d 229 (2d Cir. 2006) (affirming injunction in favor of state agency directly under PAIMI Act); *Ohio Legal Rights Service v. Buckeye Ranch, Inc.*, 365 F. Supp. 2d 877, 883-84 (S.D. Ohio

---

[13] The dissent describes the Second Circuit's decision in the Connecticut *Protection & Advocacy* case as one under section 1983, but then-Judge Sotomayor's opinion described the case as one filed "pursuant to 42 U.S.C. § 1983 and PAIMI." 448 F.3d at 122. The Connecticut protection and advocacy system is a state agency much like IPAS. See Conn. Gen. Stat. § 46a-7 *et seq*. If the dissent is correct that state agencies cannot sue under section 1983 or the PAIMI Act, then the Second Circuit's decision was erroneous. And if the dissent is correct, then a Wisconsin state agency overlooked a winning argument in *Disability Rights Wisconsin*, 463 F.3d at 725 (granting relief directly against state agency).

2005) (granting injunction under PAIMI Act in favor of state agency protection and advocacy system against private care-giver); *Equip for Equality, Inc. v. Ingalls Memorial Hosp.*, 292 F. Supp. 2d 1086 (N.D. Ill. 2003) (granting injunction against private care-giver directly under PAIMI Act and state law); *Kentucky Protection and Advocacy Div. v. Hall*, 2001 WL 34792531 (W.D. Ky. Sept. 24, 2001) (granting declaratory relief in favor of state agency under PAIMI Act against private care-givers); *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F. Supp. 2d 1039, 1047-50 (E.D. Wis. 2001) (ordering both public and private care-givers to provide access to records to private protection and advocacy system under PAIMI Act); *Trautz v. Weisman*, 846 F. Supp. 1160, 1162-63 (S.D.N.Y. 1994) (holding that state protection and advocacy system could seek relief directly under PAIMI Act against private care-givers).

Although we have not persuaded our dissenting colleague, we have tried to remain true to our role as judges rather than legislators, interpreting the PAIMI Act based on its language, structure, and purpose rather than enacting a new-and-improved brand as a matter of judicial preference. As we have explained, close attention to the language and structure of the PAIMI Act shows that Congress made sufficiently clear its intention to authorize protection and advocacy systems to sue directly under the PAIMI Act to enforce their rights to access to patient records against both public and private care-givers for the mentally ill. As between our interpretation and the dissent's, our interpretation is more consistent with the language, structure, and purpose of the PAIMI Act as a whole.

The dissent's approach, by contrast, interprets the Act as creating a strange remedial patchwork full of holes and self-defeating funding cut-offs. In the dissent's view, in the 42 states that chose to designate private entities as their protection and advocacy systems, the private entities can sue under section 1983 to obtain records from public care-givers (those who act under color of state law). But those same private entities apparently cannot sue to obtain records from private care-givers because section 1983 would not apply.[14] On the other hand, in Indiana and the six other states that chose to designate public agencies as their protection and advocacy systems, the dissent would hold that the public agencies cannot sue to obtain records from state care-givers. Section 1983 does not apply, and the PAIMI Act does not authorize such a lawsuit. (A state could choose to enact legislation authorizing such a suit as a matter of state law, but the PAIMI Act does not require it to do so.) Yet the dissent also seems to suggest that IPAS and the other public agencies might be able to sue private care-givers to obtain records directly under the PAIMI Act (because such private care-givers are not protected by the "clear-statement" rule, see *post* at 58).

---

[14] We are not entirely certain whether the dissent would interpret the PAIMI Act as itself authorizing private entities to sue private care-givers for access to records. The logic of the dissent's point that private care-givers are not protected by the "clear-statement" rule (see *post* at 58) suggests that this more limited right to sue private defendants can be inferred directly from the PAIMI Act.

Congress would have been free to enact such an inconsistent and even arbitrary remedial patchwork, of course (though it would be inconsistent with most of the cases cited above and many others). Yet the language of the statute does not give any signal that Congress intended such an odd result. We will not readily attribute to Congress the intent to do so when the more straightforward alternative is available: recognizing that protection and advocacy systems have a right to sue directly under the PAIMI Act for injunctive and declaratory relief to enforce the right to obtain the records granted by the Act itself.

IV.  *"Records" Under the PAIMI Act*

Turning to the merits, the defendants argue that the peer review records IPAS seeks are not "records" under the PAIMI Act. Defendants rely on the PAIMI Act's subsequent legislative history and a Department of Health and Human Services regulation. In light of the language of the PAIMI Act itself, however, we join all other circuits that have addressed the issue and agree with IPAS that peer review records are "records" under the PAIMI Act.

The Second and Third Circuits reached this conclusion in opinions authored, coincidentally, by future Justices Sotomayor and Alito. See *Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction & Advocacy Servs.*, 448 F.3d 119, 128 (2d Cir. 2006) (Sotomayor, J.) ("The plain language of PAIMI that grants [the P&A system] access to 'all records of . . . any individ-

ual,' including 'reports prepared by any staff of a facility,' encompasses peer review reports."); *Pennsylvania Protection & Advocacy, Inc., v. Houstoun*, 228 F.3d 423, 428 (3d Cir. 2000) (Alito, J.) (holding that the Act required access to peer review records and noting that the PAIMI Act requires that protection and advocacy systems "be given access to a defined category of records. . . . The statutory language cannot reasonably be construed to encompass identical peer review reports in some states but not others. If Congress wished to achieve that result, it needed to enact different statutory language."). The Eighth and Tenth Circuits have agreed, as well. *Missouri Protection & Advocacy Servs. v. Missouri Dep't of Mental Health*, 447 F.3d 1021, 1023 (8th Cir. 2006) (refusing to "resort to congressional committee reports as interpretive devices" and rejecting contrary agency interpretation because the PAIMI Act's record access requirement is unambiguous); *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262, 1270 (10th Cir. 2003) (after examining the statutory language and according it a straightforward interpretation, concluding that "records" under the PAIMI Act include peer review and quality assurance records). Enough has been said already on the subject. We agree with the treatment of this issue in those cases.

The judgment of the district court is modified to provide that the declaratory and injunctive relief runs against only the named state officials in their official capacities. As modified, the judgment is affirmed.

POSNER, *Circuit Judge.* I join Judge Hamilton's opinion without reservation, but write separately to emphasize some practical considerations that seem to me to favor recognition of IPAS's right to sue to obtain patient records.

The federal Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. §§ 10801 *et seq.*, assigns to "protection and advocacy" agencies such as IPAS ("Indiana Protection and Advocacy Services," an Indiana state agency that is independent of the governor and the attorney general) a whistleblower, ombudsman, watchdog, advocacy, and "private attorney general" role. Rather than loading the Department of Health and Human Services or the Justice Department with additional enforcement responsibilities, Congress told the states in effect: "if you want, we will give you federal money to help prevent the abuse of mentally ill persons in your state, but you will have to agree to designate an agency, either public or private as you choose, to 'protect and advocate for' the rights of such persons, and the agency, which we'll be paying for, must be given access to certain patient records without which it cannot perform its assigned role effectively."

But what if the hospital that has the records refuses to grant IPAS access to them? Can IPAS sue the hospital to get access? (I think we all agree that if IPAS has a right of action under the federal statute it makes no difference whether the hospital is public or private; the disagreement is over the "if.") If not—if IPAS is a helpless bystander to the state's thumbing its nose at the statute under which it has received federal money—still

the federal government would not be *completely* without a remedy; it could close the money spigot. 42 C.F.R. § 51.10; see also 42 U.S.C. § 10803; cf. 20 U.S.C. §§ 1232g(f), 1234c(a), d(a); *Gonzaga University v. Doe*, 536 U.S. 273, 278-79 (2002). But that (to change metaphors) would be cutting off one's nose to spite one's face. The unfortunates in Indiana who are the intended beneficiaries of the federal program would be worse off were the program in that state to be defunded. See *Guardians Ass'n v. Civil Service Commission*, 463 U.S. 582, 601-02 (1983) (plurality opinion); *Cannon v. University of Chicago*, 441 U.S. 677, 704-06 and nn. 38-39 (1979); *Board of Public Instruction v. Finch,* 414 F.2d 1068, 1075-76 and n. 11 (5th Cir. 1969). Of course the threat to defund might be enough to bring the state to heel. But that is not certain. The state and the federal government would be playing a game of chicken—with Indiana's mentally ill citizens the victims of any collision that might result.

Now it is true and important that statutes are compromises between competing values and also between competing interests, and for either reason or both reasons the remedies for violations of a statute may be weakened as the bill runs the legislative gauntlet. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 445-46, 461 (2002); *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam); *First Bank v. DJL Properties, LLC*, No. 10-8008, 2010 WL 1050283, at *2 (7th Cir. Mar. 24, 2010); *In re Establishment Inspection of Skil Corp.*, 846 F.2d 1127, 1133-34 (7th Cir. 1988). They may even be weakened to the point of impotence. But the state does not argue that a

legislative compromise deprived the bill of effective remedies.

Conceivably the federal government could sue the state hospital, even without express statutory authorization, for an injunction requiring the hospital to give IPAS access to the patient records in question. The state accepted federal money in exchange for promises that included giving the watchdog agency access to patient records. The state's acceptance created a contract and the federal government, if it sought specific performance of the state's obligation, would be enforcing a federal common law contractual right, as recognized in such cases as *Cotton v. United States*, 52 U.S. 229 (1850); *Woods v. United States*, 724 F.2d 1444, 1449-50 (9th Cir. 1984), and *United States v. Marion County School District*, 625 F.2d 607, 609-11 (5th Cir. 1980). See also the dissenting opinion in *Guardians Ass'n v. Civil Service Commission*, *supra*, 463 U.S. at 630-31, and the concurring opinion in *Bell v. New Jersey*, 461 U.S. 773, 794 (1983)—the majority opinion treated the question whether the federal government had a common law right to recover funds spent in violation of the federal grant as open. *Id.* at 782 n. 7.

But this route to relief is indirect and even redundant compared to a suit by IPAS. It would involve three parties—IPAS, the state, and the federal government, rather than just IPAS and the state. It would also be a transparent effort to circumvent a rule, if there is a rule, that forbids recognition of IPAS's right to sue the hospital because the right is not explicitly stated in the statute. For if a right of IPAS to sue for the records can't

be inferred from the statute, neither can a right of the federal government to do so. Indeed the interpretive stretch would be greater. The statute entitles a protection and advocacy agency to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B). It says nothing about a suit by the federal government.

There are two possible construals of the right created by the statutory language that I just quoted. One is that IPAS merely has the legal capacity to bring a suit, like a corporation. The conferral of that right would say nothing about what suits it could bring. *Board of Education of City of Peoria v. Illinois Board of Education*, 810 F.2d 707, 709-10 (7th Cir. 1987); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1559, p. 441 (2d ed. 1990) ("capacity has been defined as a party's personal right to come into court, and should not be confused with the question of whether a party has an enforceable right or interest"); see also Fed. R. Civ. P. 17(b). Maybe it could just bring the kind of suit a corporation or individual might bring, such as a suit for unpaid rent. But alternatively the statutory language could mean that IPAS can bring suits that are essential to its playing its "protect and advocate" role, including suits to enforce its statutory right of access to patient records. And not just suits in a representative capacity, seeking relief for particular persons injured by the state's flouting its statutory duty. IPAS can act in such a capacity as well, but the right to do so is conferred

in a separate subsection of the statute. 42 U.S.C. § 10805(a)(1)(C).

It's not as if IPAS could obtain an effective legal remedy from the state courts of Indiana. It could not. And the fact that the right that the federal statute confers on IPAS—the right of access to patient records—expressly preempts any state law prohibiting such access, see 42 U.S.C. § 10806(b)(2)(C); *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262, 1272-73 (10th Cir. 2003); *Pennsylvania Protection & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 427-28 (3d Cir. 2000), makes it all the more likely that Congress expected the right to be enforceable in a federal court. Cf. *Rice v. Office of Servicemembers' Group Life Ins.*, 260 F.3d 1240, 1247 (10th Cir. 2001).

It is not an insuperable obstacle to this suit that ever since *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court has been wary of inventing private remedies for statutory violations and now requires that the private right of action be inferable from the statute itself. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15-22 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571-78 (1979). The requirement reflects a realistic understanding of the role of compromise in the legislative process. Private remedies, especially private damages remedies, can greatly magnify the force of a statute. If a remedy can be imposed only in an action by a public agency—say a cease and desist proceeding by an ad-

ministrative agency like the Federal Trade Commission—the potential targets of such an action have the protection of prosecutorial discretion, which places a screen between a private complaint and an enforcement action, and are not exposed to liability for damages awarded in private suits in amounts that might (in a class action for example) cause bankruptcy. For a court to spring a private remedy on the persons or firms subject to a statute is thus to change the legislative deal dramatically.

There is nothing like that here. There is no suggestion that IPAS can sue a hospital for damages, which would have the potential to harm hospitals far more than could an order to grant access to records and would be likely to increase the cost of hospital services. "Because the private right of action under Title IX [of the Civil Rights Act of 1964] is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 284 (1998). The sensible remedy in this case is an injunction commanding access.

A private right of action with appropriate remedies can be inferred from a statute that evinces a congressional intent to authorize such a right, *Transamerica Mortgage Advisors, Inc. v. Lewis, supra*, 444 U.S. at 15-16; *Knapp v. Eagle Property Management Corp.*, 54 F.3d 1272, 1276-79 (7th Cir. 1995); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 618-22 (2d Cir. 2002); *CSX Transportation Inc. v. Marquar*, 980 F.2d 359, 379-82 (6th

Cir. 1992), as the present statute does. The Supreme Court's decision in *Alexander v. Sandoval*, *supra*, 532 U.S. at 286—a landmark in the march begun in *Cort v. Ash* away from judicial creation of private remedies—makes this clear: "the judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create . . . a private remedy." Consistent with this language, even after *Cort* the Supreme Court has found private remedies implicit in statutes. See, e.g., *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005) (implied remedy for retaliation under Title IX); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 230-35, 240 (1996) (implied remedy under the Voting Rights Act); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) (implied remedies under the Commodity Exchange Act).

The cases rejecting judicial creation of private rights of action *ex nihilo* would defeat a suit against the state hospital administration by the guardian of a mentally ill person, seeking damages for mistreatment in a state hospital; for there is no hint in the statute of an intention to create such a right of action. That is not this case.

Nor is this a case in which the state may have been fooled into accepting federal money on conditions that, had it realized what they were, would have caused it to reject the money. The Supreme Court expressed concern with this possibility in *Davis v. Monroe County Board of Education*, 526 U.S. 629, 639-40 (1999), when it said, quoting *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17-18 (1981), that "in interpreting language

in spending legislation, we thus 'insis[t] that Congress speak with a clear voice,' recognizing that '[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it.'" See also *Barnes v. Gorman*, 536 U.S. 181, 185-88 (2002). But Indiana could not have been surprised to find that IPAS could sue it for violating a condition in the federal grant that it accepted. The state knew that by accepting the money it would be committing to provide IPAS with access to patient records—knew too that IPAS had been empowered to invoke legal remedies for violations of the rights conferred on it by the federal statute. The state could not reasonably have believed that its commitment was empty, unenforceable—that it could take the money and yet be subject to no sanction for refusing to comply with the terms of the grant except that of cancellation of the program, figuratively a kind of nuclear option, as it would blow up the mentally ill of Indiana along with the federal program.

Consistent with this analysis, the Supreme Court in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 74-75 (1992), finding that monetary damages were available to enforce an implied remedy in a spending-clause statute, rejected the contention

> that the normal presumption in favor of all appropriate remedies should not apply because Title IX was enacted pursuant to Congress' Spending Clause power. In *Pennhurst State School and Hospital v. Halderman*,

the Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was *unintentional*. Respondents and the United States maintain that this presumption should apply equally to intentional violations. We disagree. The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe. [Some citations omitted.]

The state argues that the federal courts have no business refereeing a contest between two state agencies, IPAS and the state hospital administration; and it is true in general that "federal courts should not get involved unnecessarily in what may be intramural struggles of state government even if invited to do so by one of the contenders." *Mazanec v. North Judson-San Pierre School Corp.*, 763 F.2d 845, 848 (7th Cir. 1985); see also *Cronson v. Clark*, 810 F.2d 662 (7th Cir. 1987); *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985); *Donelon v. Louisiana Division of*

*Administrative Law ex rel. Wise*, 522 F.3d 564, 568 (5th Cir. 2008). But this is not a typical case. That it is a suit between state agencies is an accident. If Indiana like most states had appointed a private entity to be IPAS and if the defendant were a private hospital, the suit would be between two private entities.

Independent as it is of the governor and the attorney general, IPAS is a state entity in name only, especially in a suit against a state hospital—there it's an agent of the *federal* government, suing to assure a state's compliance with the federal duties of care for the mentally ill that the state agreed to perform. It would be strange if a state could render the federal statute unenforceable by creating (or appointing) a public rather than a private protection and advocacy agent, or if the statute were unenforceable against state hospitals even though there is (as I think we all agree) no issue of state sovereign immunity.

One would like to know *why* Congress granted states a choice between a public and a private watchdog agency, why the minority of states (eight out of 50) that have chosen the public option have done so, and what the consequences of the choice are. Besides Indiana, the public option has been chosen by Alabama, Connecticut, Indiana, Kentucky, New York, North Dakota, Ohio, and Virginia (also American Samoa and Puerto Rico). See U.S. Dep't of Health & Human Services, Substance Abuse & Mental Health Services Administration, "Protection and Advocacy for Individuals with Mental Illness (PAIMI) Program" (Feb. 2003), http://mentalhealth.samhsa.gov/

cmhs/p&a/about.asp (visited Mar. 26, 2010). I don't know what these eight states have in common and why they made the choice they did. I do know that New York began with a private enforcer but switched to a public one in 1980, having decided that the private enforcer wasn't doing a good job. Patricia Puritz & Mary Ann Scali, "Beyond the Walls: Improving Conditions of Confinement for Youth in Custody" 30 (U.S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention Report Jan. 1998), www.ncjrs.gov/pdffiles/164727.pdf (visited Mar. 31, 2010). North Carolina switched the other way in 2007. North Carolina Dept. of Administration, "Carolina Legal Assistance Designated as North Carolina's Protection and Advocacy System," May 21, 2007, www.doa.state.nc.us/pio/news/showrelease.asp?id=0001-21MAY07 (visited Mar. 31, 2010). These examples do not suggest a pertinent difference between public and private protection and advocacy agencies. Rather they suggest that a state that hasn't had a good experience with a public agency is likely to try a private one next, and vice versa.

The secondary literature suggests—ironically in light of the present case—that public protection and advocacy agencies have an easier time gaining access to information from the state than private ones do. Melissa Bowman, Note, "Open Debate Over Closed Doors: The Effect of the New Developmental Disabilities Regulations on Protection and Advocacy Programs," 85 *Ky. L.J.* 955, 990 (1997). The main argument against public agencies—and again it is ironic in light of this case—is that they can't be expected to be "truly independent and withstand

political pressure either to not initiate an investigative action or to prematurely resolve an investigation that should be litigated." *Id.* Another argument against the public agency is that private ones may receive charitable donations to augment their resources but people rarely make a charitable donation to a public agency. None of these differences suggests that IPAS has a more limited right to sue than a private agency.

EASTERBROOK, *Chief Judge*, dissenting. My colleagues' approach to this case is in the spirit of the maxim: "Where there is a right, there must be an effective remedy." Indiana has failed to implement federal requirements that go with grants that the state has accepted, and the state is resisting efforts to enforce the federal statutes directly. The prospects of a funding cutoff or a suit by the national government are not effective enough, in my colleagues' assessment, so the court creates an additional remedy.

That approach was common in the era of *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964). But it was disavowed in *Cort v. Ash*, 422 U.S. 66 (1975). Today remedies depend on the statutory text and structure, not on judges' views about how much enforcement, and by whom, is optimal. More-

over, the maxim that a right implies a remedy applies only when there *is* a "right." The statutes in question do not confer rights on the plaintiff.

Indiana would not violate anyone's rights by turning down the federal money and disbanding Indiana Protection and Advocacy Services. The federal statute imposes conditions on a grant. A state that wants the money must fulfil the conditions. Such a state-federal contract creates third-party beneficiaries (such as Advocacy Services and the patients), but the Supreme Court has held that these third-party beneficiaries are not entitled to enforce the contract directly. See *Brunner v. Ohio Republican Party*, 129 S. Ct. 5 (2008); *Gonzaga University v. Doe*, 536 U.S. 273 (2002); *Alexander v. Sandoval*, 532 U.S. 275 (2001). The contract is enforced by the federal agency, which can end the funding or sue if the state does not keep its part of the bargain.

One reason why a state's decision to accept a grant does not imply a third-party right to litigate is the Supreme Court's clear-statement doctrine:

> Congress has broad power to set the terms on which it disburses federal money to the States, see*, e.g., South Dakota v. Dole*, 483 U.S. 203, 206–207 (1987), but when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out "unambiguously," see *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981); [*Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982)] at 204, n. 26. "[L]egislation enacted pursuant to the spending power is much in

the nature of a contract," and therefore, to be bound by "federally imposed conditions," recipients of federal funds must accept them "voluntarily and knowingly." *Pennhurst*, 451 U.S., at 17. States cannot knowingly accept conditions of which they are "unaware" or which they are "unable to ascertain." *Ibid*. Thus, in the present case, we must view the [federal statute] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds.

*Arlington Central School District v. Murphy*, 548 U.S. 291, 296 (2006). When Congress extends a lure to state governments, the conditions must be express; otherwise the state is buying a pig in a poke.

Nothing in 42 U.S.C. §§ 10801–51 alerts Indiana that, by taking the money, it agrees to be sued in federal court by its own agency, Indiana Protection and Advocacy Services. Section 105, 42 U.S.C. §10805, bears the caption "[s]ystem requirements"; it does not mention patients' rights or authorize the "system" to file suit in federal court. Section 103, 42 U.S.C. §10803, says that the Secretary may contract with states that "meet the requirements of section 105", which reiterates the point that the statute sets conditions on a grant rather than establishing personal rights.

Even if we were to treat "system requirements" the same as "system rights", nothing in either §105 or §106 says that systems have a right to sue states in federal court. (Reading "shall" in §105 as "has a right to",

which my colleagues think appropriate, does not over-come the statute's lack of a right to sue states. And treating "shall" as "has a right to" produces some mighty odd constructions. I invite the reader to run through §105 and §106, replacing each "shall" with "has a right to". For example, §105(a)(10) says that a system "shall . . . not use allotments . . . in a manner inconsistent with section 14404 of this title." Replacing "shall" with "has a right to" turns this rule on its head. It is far better to use "shall" to denote obligation rather than entitlement.)

What's more, nothing in the statute creates a personal remedy of any kind. To the contrary, 42 U.S.C. §10851(a) says that the statute "shall not be construed as estab-lishing any new rights for individuals with mental ill-ness." Without a remedy, there cannot be an implied private right of action. See *Gonzaga University*, 536 U.S. at 284.

What a state anticipates when it accepts a federal grant is that enforcement rests in the hands of the grantor, which can either turn off the spigot or sue in its own name—for, as long as the contract lasts, the federal government is entitled to compliance. See *Barnes v. Gorman*, 536 U.S. 181, 187 (2002). But the Department of Health and Human Services has neither cut off the money nor sued to enforce the contract. To subject the state to any other remedy is to transgress the principle that only clearly articulated conditions may be enforced against state recipients of federal funds.

One explicit federal right of action sometimes can be used to implement the conditions of federal grants:

42 U.S.C. §1983 authorizes suits when the defendant is a state actor and the conditions are specific enough to be enforced as rules of law. See *Maine v. Thiboutot*, 448 U.S. 1 (1980). I am content to assume that the requirements of 42 U.S.C. §§ 10805 and 10806 meet that standard. Four other courts of appeals have held this. *Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction Services*, 448 F.3d 119 (2d Cir. 2006) (Sotomayor, J.); *Pennsylvania Protection & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 428 (3d Cir. 2000) (Alito, J.); *Missouri Protection & Advocacy Services v. Missouri Department of Mental Health*, 447 F.3d 1021 (8th Cir. 2006); *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262, 1272 (10th Cir. 2003). But Advocacy Services is part of Indiana and so is not a "person" within the scope of §1983. *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). Forty-two states created their advocacy agencies as private entities, which could take advantage of *Thiboutot*. Indiana did not. Because plaintiff is not a "person," it can't use §1983. See also *Illinois v. Chicago*, 137 F.3d 474, 477 (7th Cir. 1998).

Advocacy Services contends, with the support of the United States as *amicus curiae*, that, because it relies on federal funds, it isn't "really" part of Indiana and therefore can use §1983. The argument that an entity is "not the state" if its funding is federal was made and roundly rejected in *Regents of University of California v. Doe*, 519 U.S. 425 (1997). Indiana Protection and Advocacy Services is part of the state, whose governor appoints a third of the Board (see 42 U.S.C. §15044(a)(2); Ind. Code §12-28-1-6(a)). (No one else appoints any member; the Governor's appointees initially chose the rest of the

board, which since has picked its own members other than the Governor's selections.) Advocacy Services has the same powers as other state agencies to make administrative rules, Ind. Code §12-28-1-12(7), and its employees are civil servants, *id*. at §12-28-1-12(2). Its offices are in state buildings, and its web site (http://www.in.gov/ipas/) is part of Indiana's; the site's header is the name and picture of Indiana's governor. It is the organization chart rather than sources of funds that distinguishes the states from other kinds of entities. (And if this is wrong, and federal funding means that Advocacy Services is "not the state," then Advocacy Services would be a federal instrumentality, and again not a "person" under §1983.)

Thus §1983 is unavailable. Is there an alternative source of authority to sue?

One possibility is that a right of action may be implied directly from the substantive federal statute, without the need for aid from §1983. But the Supreme Court's cases do not support that approach. The closest is *Cannon v. University of Chicago*, 441 U.S. 677 (1979). It is not enough, for three reasons.

First, the defendant in *Cannon* was a private organization, so the clear-statement requirement did not apply.

Second, the Court's rationale was that, when enacting Title IX of the Education Amendments of 1972, Congress relied on decisions creating private rights of action, using pre-*Cort* law, under a different statute. 441 U.S. at 694–703. Title IX is a pre-*Cort* statute; the Justices were unwilling to frustrate reliance interests that underlay

it. Justices Stewart and Rehnquist, whose votes were essential to the majority in *Cannon*, wrote separately to make it clear that the legislative reliance on pre-*Cort* law was essential to the outcome. 441 U.S. at 717–18. But no one contends that, when it enacted 42 U.S.C. §§ 10801–51 more then a decade after *Cort*, Congress relied on decisions allowing state agencies to sue their own states; there are no such decisions.

Third, *Cannon* observed that the plaintiff was a member of a special class for whose benefit the statute was enacted. 441 U.S. at 689–94. Advocacy Services is not a member of any class supposed to receive a benefit from the federal legislation; it is an ombudsman designed to provide assistance to patients. Advocacy Services wants information that it may be able to use to make suggestions for improving Indiana's mental-health-care system. That is a long distance from the model of personal rights that was vital to the disposition in *Cannon*.

The remit of an administrative agency such as Advocacy Services does not affect anyone's "personal" rights—and the Court has stated repeatedly that a private right of action will be implied only when necessary to vindicate *the plaintiff*'s personal rights. E.g., *Thiboutot* (deprivation of the plaintiff's welfare benefits); *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005) (plaintiff's right to be free of retaliatory discharge). By contrast, "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (internal quotation omitted).

My colleagues (both the majority opinion and the concurring opinion) believe that Advocacy Services should be allowed to sue precisely because it is *not* trying to vindicate its own rights. It is an advocate for the mentally disabled, and my colleagues think that it should occupy a privileged position as a protector of others. That policy argument might be a sound one, yet the Supreme Court has held that a private right of action will be implied from a funding statute only when necessary so that the litigant may vindicate his or her *personal* rights. Perhaps my colleagues will persuade the Justices to change their doctrine, but under existing doctrine a personal right is essential.

Indeed, under existing doctrine a personal right often is not sufficient even when the federal statute is unconditional (that is, not tied to a grant). E.g., *Thompson v. Thompson*, 484 U.S. 174 (1988) (no implied private right of action to enforce Parental Kidnapping Prevention Act of 1980); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) (no implied private right of action to enforce the Investment Advisers Act of 1940). Since *Cort* the Justices have never created a private right of action on behalf of anyone other than a private person trying to vindicate statutory rights enacted for his personal benefit. Advocacy Services is not in that category.

My colleagues say that the federal statute has given "rights" directly to Advocacy Services. Yet any rights in §105 or §106 are for the benefit of patients, not "systems." Advocacy Services is not trying to improve its own mental health! What's more, these statutes do not create

rights; they create duties. As I have already mentioned, the statute calls the subsections in §105 "requirements." They are obligations laid on a grant's recipient—that is, on Indiana, not on Advocacy Services. Indiana may have a duty to confer rights on Advocacy Services, but §105 does not confer any rights directly. Nothing in the statute gives any entitlement to any "system" established under the Act; instead the statute tells the state what conditions it must meet to be eligible for federal funds (and to drive the point home §10851(a) says that the statute does not add to patients' rights).

The only thing looking remotely like a "right" held by an agency to which funds are routed—and the provision on which the majority principally relies (pages 21–22)—is the exhaustion requirement in §107(a), 42 U.S.C. §10807(a). This subsection provides that, before filing suit, the "system" must exhaust any other remedies. My colleagues say that this "provision would have little purpose if protection and advocacy systems . . . were not empowered to sue" (page 22). Not at all. Section 107(a) speaks of filing suit "on behalf of a [sic] individual with mental illness". A "system" may sue on behalf of mentally ill persons, whose own entitlements supply the right of action, see 42 U.S.C. §§ 10804(c), 10805(a)(1)(C), but the current proceeding is by Advocacy Services on its own behalf and so is outside of §107(a). And there is a more general problem: the majority's approach turns a *precondition* to suit (that's what an exhaustion requirement is) on someone else's behalf into an *authorization* to sue on one's own behalf.

The transmutation is unwise. The proposition that §107(a) has "little purpose" if it doesn't authorize a system to sue on its own behalf is hyperbole. Section 107(a) serves many functions. First, §107(a) applies to suits that systems file on behalf of persons with disabilities. Second, if §107(a) applies at all to suits by systems in their own names, it covers litigation in state court. Third, it applies to suits filed under §1983 by private "systems" (which, recall, exist in 42 states). Fourth, it applies to suits that public systems file against private defendants, which are not protected by the Supreme Court's clear-statement principle. We should treat §107(a) as what it purports to be: a restriction on litigation rather than a backhanded grant of authority to sue. Section 107(a) assuredly is not the "clear statement" required by *Arlington Central* and similar decisions.

A few words are in order about *Ex parte Young*, 209 U.S. 123 (1908). Now that we are sitting en banc, and thus more willing than a panel to create a conflict, I accept my colleagues' view that *Young* (read in connection with *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002)) overcomes any sovereign-immunity defense. I therefore join my colleagues in disagreeing with *Virginia v. Reinhard*, 568 F.3d 110 (4th Cir. 2009). But to say that a claim against a state officer sidesteps sovereign immunity is not enough; plaintiffs still need a right of action. Most suits to which *Young* applies rest on §1983; in *Verizon*, 47 U.S.C. §252(e)(6) supplied an express right of action; Advocacy Services lacks any equivalent.

*Brunner* illustrates my point. The Help America Vote Act of 2002 requires state officials to take specific steps to ensure that all persons entitled to vote are properly registered, while other names are purged from the rolls. The statute applies, however, only to states that accept federal grants that defray the cost of meeting the federal objectives. See 42 U.S.C. §15301. Ohio took the federal money but, according to plaintiffs in a §1983 suit filed under *Ex parte Young* against Ohio's Secretary of State, failed to perform its obligations. As a result, plaintiffs contended, invalid votes would be counted.

The district court entered an order directing the Secretary of State to comply with §303 of the Act, 42 U.S.C. §15483(a)(5)(B)(i) (2000 ed. Supp. V), which requires the state's election officials to "match information in the database of the statewide voter registration system with information in the database of the [state's] motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." The court of appeals affirmed, holding that §303 establishes rights that can be enforced under §1983 and that judicial relief was essential to ensure a reliable election. 544 F.3d 711 (6th Cir. 2008) (en banc).

Everything that my colleagues say about 42 U.S.C. §§ 10805 and 10806 was true about 42 U.S.C. §15483(a)(5)(B)(i). Each statute establishes specific responsibilities for states that take the federal money. Each state balked at carrying out its obligations. Each plaintiff used *Ex parte Young* to sidestep sovereign im-

munity. Each suit sought prospective relief rather than damages. Each plaintiff wanted a systemic improvement rather than the vindication of person-specific entitlements. Other ways of enforcing each statute appeared to be ineffectual; neither federal agency revoked the grant or filed suit to enforce the conditions. And *Brunner* was easier for the plaintiff, which was not part of the state and so could invoke §1983 as the right of action. Yet the Supreme Court reversed—unanimously and summarily.

Observing that §303 is a condition on a federal grant and not a free-standing entitlement, the Supreme Court cited *Gonzaga University* and *Sandoval* for the proposition that the plaintiff could not obtain interlocutory relief even if the state was clearly violating §303. In other words, the suit was doomed, so the plaintiff lost even on the assumption that irreparable injury was certain to occur. The opinion in *Brunner* was one paragraph long. The Supreme Court's point was simple. My point is equally simple—and, to repeat, this case is *weaker* for the plaintiff than was *Brunner*, because Advocacy Services is a state agency that can't use §1983.

Not so, my colleagues say, because this statute lacks something present for the Help America Vote Act (and the statutes at issue in *Gonzaga University* and *Sandoval*): an administrative enforcement process. Without one, there won't be enough enforcement (pages 29–30), "unfair" or "counterproductive" results will ensue (pages 16–17, 31), and the federal courts must step in. As I said at the outset, that is the method of *Borak*, a method that the

Justices repudiated in 1975. Congress, not the judiciary, decides whether enforcement via litigation is essential. But the majority's premise also is not correct. There *is* an administrative enforcement process. The Secretary of Health and Human Services has established one by regulation. 42 C.F.R. §51.10, incorporating the procedures of 45 C.F.R. Part 74 and 42 C.F.R. Part 50. The administrative mechanism may or may not be optimal—my colleagues think that it isn't, because it operates only against the "system" (page 30 n.12)—but that decision is for Congress, the President, and the Secretary to make; a court ought not declare that more is required and then establish an enforcement mechanism of its own design.

Both the majority opinion and the concurring opinion express a belief that statutes such as this one should not be enforced by terminating grants. "[C]utting off one's nose to spite one's face", the concurrence puts it at page 39. This reflects a fundamental disagreement with the Supreme Court, which has held that the principal and often exclusive method of enforcing conditions on federal grants is by funding curtailments. Perhaps my colleagues have a wise view as a matter of policy, but the Supreme Court's perspective is the one we must use in a hierarchical judicial system. I don't think that the Justices' perspective can be avoided by saying that Gonzaga University was an offender, while Advocacy Services is a vindicator of rights. That won't distinguish *Brunner*. And the vindicator/violator line misses the point that the threat of funding cutoffs is what induces violators such as Gonzaga University to conform. Deterrence is not limited to the criminal law. There would be

even more reason for these institutions to comply if federal courts could award damages or issue injunctions, but *Brunner*, *Gonzaga University*, and *Sandoval* curtail that option.

The concurring opinion expresses confidence that an injunction is superior to the threat of administrative funding cutoff because then "[t]he state and the federal government would be playing a game of chicken—with Indiana's mentally ill citizens the victims of any collision that might result" (page 39). Put to one side the fact that the Secretary of Health and Human Services is not limited to yanking the grant; she can sue to enforce the grant's conditions. Suppose that the Secretary's only lever were cash. Why should we think that it is *only* the Secretary who plays chicken with the state? Indiana tells us that it cares deeply about whether it is subject to suit in federal court by Advocacy Services. Our affirmative answer may lead Indiana to reject the grant and send Advocacy Services' staff to the unemployment line. It is not possible to say that the Secretary's levers commence a game of chicken while the judiciary's levers don't. At least the Secretary can *negotiate* with Indiana to find a satisfactory solution. All the judicial branch can do is issue judgments. Once we have issued ours, everything is in Indiana's hands, and if we drive the state to end this program there is nothing we can do to bring it back again.

If the Secretary passes out federal money without enforcing the conditions, that's unfortunate, but it is hard to see how it can be called "unfair" to anyone other than the federal taxpayers. The Secretary has ample

means to ensure that the federal dollars are not wasted. And the majority's view that litigation must be authorized, because cutting off funds would be "counter-productive," is impossible to reconcile with *Brunner*, *Gonzaga University*, or *Sandoval*; it would mean that conditions attached to federal grants *always* may be enforced by private litigation—at least if the judges approve the goal of the grant program. The Supreme Court has held otherwise.

Both Indiana Protection and Advocacy Services and Indiana Family and Social Services Administration believe that they have patients' interests at heart, though they disagree about how to serve those interests. Fights between two state agencies should be resolved within the state (including the state's judiciary, if state law so provides), or through the auspices of the Department of Health and Human Services, which administers the federal grant program. This statute establishes a program of cooperative federalism. Cooperation usually requires negotiation and compromise among multiple public bodies. That is the way of the administrative rather than the judicial process. We should dismiss this suit and let the administrative process take its course.